## BOARD OF CANVASSERS OF ELECTION

*vs.*

## HART B: NOLL.

AND

## HART B. NOLL

*vs.*

## BOARD OF CANVASSERS OF ELECTION.

*Election laws*: *tally sheets; discrepancies; duty and authority of Board of Canvassers; ballot boxes, condition of—.*

The Board of Canvassers have no power to reject the returns of an election precinct on the ground that the strip of paper required by Art. 33 of the Code to be pasted on the ballot box has been torn, broken and virtually destroyed. The ballot boxes used at an election are not part of the returns and are not before the Board of Canvassers, as such, and at the time of the canvass they should be in the custody of the Clerk of the Circuit Court for safekeeping.                    pp. 300-301

In case of a contest, the condition of the ballot boxes may become material and pertinent, but not at the canvass by that Board provided for by Article 33.                    p. 301

The ballot boxes of an election form no part of the election returns, referred to in sections 82 and 83 of Article 33 of the Code, and the Board of Canvassers, as such, have no right to have the ballot boxes before them.                    p. 300

While the conditions of the ballot boxes may be pertinent and material in an election contest, it can not present a question for the decision of the Board of Canvassers.                    p. 301

Where tally sheets, returned by the judges and clerks of an election, differ, the statute does not authorize or require the Board of Canvassers to decide or choose between them.     p. 304

In such cases, if it clearly appears that mistakes have occurred in any of the statements or tallies made to the Board of

Canvassers, it is their duty, under section 85 of Article 33, to subpœna the judges and clerks who made the returns, etc., who must appear and make such corrections as the facts of the case may require.                                      pp. 306-307

One tally sheet of an election district had 275 marks for one candidate, named O'Malley (there being six instead of five marks in each of three blocks), and the other only had 272 marks for that candidate. The four judges and two clerks certified on both tally sheets, and in their written returns, that 272 votes were cast for O'Malley. *Held*: that the Board of Canvassers were not justified in counting 275 votes for O'Malley.                                   pp. 307, 311

*Decided December 16th, 1915.*

Cross appeals from the Circuit Court for Howard County. (Thomas, C. J., and Forsyth, Jr., J.)

The facts are stated in the opinion of the Court.

The appeals were argued together before Boyd, C. J., Briscoe, Burke, Pattison, Urner, Stockbridge and Constable, JJ.

*Chas. C. Wallace* and *Isaac Lobe Straus* (with whom were *Arthur P. Gorman, Jr.,* and *D. C. Higinbotham,* on the brief), for Philip Smallwood *et al.*

*Henry W. Williams* and *William L. Marbury* (with whom were *James Clark* and *William L. Rawls* on the brief), for Hart B. Noll.

Boyd, C. J., delivered the opinion of the Court.

Hart B. Noll and John F. O'Malley were candidates for the office of Clerk of the Circuit Court for Howard County at the election held November 2, 1915. The Board of Canvassers rejected the returns of the First Precinct of the Second Election District of that county, which it is alleged showed a plurality of forty-five votes for Noll, and counted 275 votes for O'Malley, instead of 272 votes, in the Sixth Election District, which resulted in a plurality of forty-

seven votes for O'Malley over Noll, instead of a plurality of one for Noll over O'Malley, which it is claimed the returns showed on their face.

Noll filed a petition for a mandamus in the Circuit Court for Howard County, "To the end therefore that the said defendants may be ordered to reconvene and correct the errors made by them as above set forth," and asking for a rule against the members of the Board of Canvassers, to show cause why a mandamus should not be issued "to compel the said defendants to correct the errors complained of." An order was passed and the defendants answered. A demurrer was filed to the answer, and after a hearing the lower Court passed an order by which the demurrer was sustained; and it provided that:

"Upon the facts stated in the petition and admitted in the answer of the defendants, and the admission of counsel, it is further ordered that the writ of mandamus issue forthwith, commanding the defendants to convene as a Board of Canvassers and to issue a subpœna to the Judges and Clerks of Election of the Sixth Election District of Howard County, at the election held on the second of November, 1915, requiring them to attend before said Board of Canvassers and make such corrections in the returns from said Election District as the facts of the case require, such changes not to alter any decision 'before duly made by them,' and commanding the Board of Canvassers of Howard County, after such corrections in the returns from said Sixth Election District have been made as aforesaid, to canvass the votes for the Clerk of the Circuit Court for Howard County, in the First Precinct of the Second Election District of said County, as shown by the returns and tally sheets thereof delivered to said Board of Canvassers, and to add up said votes, together with the votes for the Clerk of the Circuit Court for Howard County in all other districts of said County, as shown by the returns and tally sheets of the election held on the second of November, 1915, in said county,

and to make abstracts and statements of the same, and
to transmit such last named statements, so to be made
by the defendants as aforesaid, attested by the signa-
ture of their Chairman and Secretary, to the Clerk of
the Circuit Court of said County."

Both sides appealed from the order so passed, and at their
instance we advanced the case for hearing.   The appeal of
the petitioner Noll is based on the theory that the order of
Court was not in accordance with the prayer of the petition
and the admissions in the case—that the Court ought to have
granted the prayer to require the defendants to correct the
alleged error made by them in counting 275 votes, instead of
only 272 votes for O'Malley in the Sixth Election District.
The defendants contend that the demurrer ought to have been
overruled and the petition dismissed, and that the order for
a mandamus is not in accordance with the prayer of the peti-
tion.   It is likewise contended that the determination of the
canvassers in reference to the 275 votes was not subject to
review by the Court and that O'Malley, having received 275
votes in the Sixth Election District, had a plurality of two
votes over Noll, even if the alleged plurality of 45 votes,
claimed in the petition to have been received by Noll in the
First Precinct of the Second District, be allowed him, and
hence a mandamus would be nugatory. ᛫ Some other points
are made, but we will first consider the two principal ques-
tions in the case, as their determination may relieve us of the
necessity of discussing some which may be regarded as of
more technical character.   A contest over an election to this
office must, of course, be made, if at all, before the House
of Delegates, as provided by section 12, Article 4 of the
Constitution, but that does not affect the power of the Court
to require the Board of Canvassers to correct errors, if any,
as provided for in section 86 of Article 33 of the Code.

The two main questions may be thus briefly stated:   1.
Did the Board of Canvassers properly and legally reject the
returns from the First Precinct of the Second Election Dis-

trict? 2. Did they have the right to count 275, instead of 272 votes for O'Malley in the Sixth District?

1. The canvassers say in their answer that they rejected the returns from that precinct, because when the "ballot box was delivered to and produced before these defendants, it was found that the seals required by law to be put upon the same were broken and destroyed, that the strips of paper containing the signatures of and authentication by the judges and required by law to be placed, pasted and sealed over the slits, keyholes, edge of the lid and other parts of the ballot box had been torn, broken and virtually destroyed, so that it was fully manifested that said ballot box had been seriously tampered with and its authentication and identity as the ballot box of said precinct in large measure destroyed."

Although the canvassers did reject and refuse to count the returns from that precinct, which the petition alleges had given Noll a plurality of 45 votes, and thereby did make it appear by the statements made by them under sections 82 and 83 of Article 33, that O'Malley had a plurality of 47 votes in the county (including the three votes to be considered below), it was not and could not be seriously urged in this Court that the canvassers had the right to reject those returns. Section 82 provides that, "The Board of Canvassers shall, upon being duly organized, open all the original statements or returns and tally sheets delivered or transmitted to them, and shall canvass and add up the votes and make abstracts or statements thereof in the following manner, as the case may require, namely," etc. This Court said in *Price* v. *Ashburn*, 122 Md. 514, that "It has been repeatedly held, that the duties of canvassing officers are purely ministerial and under the facts of this case, the canvassers could only canvass and declare the result as shown by the returns."

Regardless of all other matters, the plain and conclusive answer to any contention that they could reject the returns of a district or precinct for such reason as is given in the answer is that the ballot boxes are not before them as canvassers. They are in no sense a part of the returns before

them.  We have shown above what they have before them, and by section 77 the judges of election in the counties are required to deliver to the proper officers the ballot boxes, keys, etc., before 12 o'clock noon of the second day after the election, and by section 78, it is provided that "The Board of Supervisors of Elections, upon receiving a ballot box and the key thereof, shall note the condition of the seal or stamp on each box, and make an entry of the facts touching the same in a book to be kept by them, together with the name of the officer who delivered the box.  They shall deliver all the ballot boxes so sealed as aforesaid to the clerks of the Circuit Court for their respective counties * * * who shall put them in a secure place to which the public shall in no case have access," etc.  The Board of Canvassers, as such, have no right to have them before them, as they should then be in the custody of the clerk for safe keeping.  In the answer it is not even alleged that the Board of Supervisors of Elections had noted any unusual condition about this box, but if they had so noted, the condition of the ballot boxes was, under the statute, of no more concern to the canvassers while acting in that capacity, than was the condition of any election booth which might be returned.  In case of a contest the condition of the former often becomes material and pertinent, but not at the canvass by that board.

The powers conferred on the Board of Canvassers are wholly different from those conferred on the same individuals when acting as Supervisors of Elections.  It is not easy to understand how the canvassers could have gone so far wrong, as to suppose they had the power to reject those returns by reason of the condition of the ballot box.  It is too clear to require further discussion that they had no such power, and they should be counted.

2.  But after counting the votes in that precinct, O'Malley would still have a plurality of two over Noll, and an important question, therefore, is whether the canvassers were right in counting 275 votes for him in the Sixth District. It is not denied that one tally sheet and the returns of the

four judges and two clerks for that district showed that O'Malley received only 272 votes, but in three blocks of the other tally sheet, there were six marks instead of five. Those three marks were not counted by the clerks of election, but were by the canvassers—hence the 275 votes, instead of 272. The petition alleges:

> "That said three votes so erroneously counted for said O'Malley by the said defendants were so counted by the defendants, or rather by two of said defendants, to wit, Philip S. W. Smallwood and Mathew A. Powers, the defendant, Walter S. Black, not concurring therein, upon the plea or pretense that three of the blocks upon one of the tally sheets of said 6th Election District did contain six pencil marks instead of five, although said three blocks were in each case tallied by the clerk of election as containing five marks each, and the total of said tally sheet as noted thereupon by the clerk of election showed only two hundred and seventy-two votes to have been cast for said O'Malley, as did also the remaining tally sheet and the statements of the results executed and returned according to law."

The answer alleges:

> "They respectfully show that the tally kept and made by one of the clerks of said Sixth Election District of the votes cast at said election in said district as required by law and the tally sheet made out by him containing said tally so made and kept by him, and which said tally sheet was returned to the Board of Canvassers as required by law for the purpose of canvassing the votes cast in said district at said election, contained clearly and distinctly and in the judgment of a majority of the Board of Canvassers, beyond the possibility of dispute, 275 tally lines or marks recorded as and representing votes cast at said election in said Sixth District for said O'Malley for said office of Clerk, and that accordingly, the said majority of the Board of Canvassers being convinced that said tally sheet correctly represented and set forth the results

of the election in said district, counted for said O'Malley the number of votes, namely, 275 votes, which appeared thereupon for said O'Malley. * * * That these defendants had to choose between the tally sheet aforesaid which showed that O'Malley had received 275 votes and the other tally sheet from said election district which showed that said O'Malley had received 272 votes; * * * and that in the exercise of their duties and powers, imposed upon them by law, being bound and required to determine which of the two tally sheets truly set forth the correct number of votes received by said O'Malley in said Sixth District in said election, they deemed it right and proper to give effect to the tally sheet, aforesaid, which contained 275 strokes or marks for him, not only because said tally sheet from its appearance commended itself to them as preferable, but because it contained clear, positive, original and contemporaneous entries or records of 275 votes actually cast for said O'Malley and set down upon said tally sheet by the clerk in the discharge of his duties respecting the same, whilst the ballots were being inspected, the results of the marks made by the voters upon them being announced, and the count of the votes and the making of the tallies recording the same going on."

It is impossible to find in the answer any satisfactory reason for the two canvassers adopting 275 as the correct number of votes cast for O'Malley, when the other tally sheet only had 272 "tally lines or marks," as the answer calls them, and the four judges and two clerks certified on *both tally sheets* and in the statements or written returns that 272 votes were cast for O'Malley. If it were true that they "had to choose between" the two tally sheets, as their answer alleges, no good reason is disclosed for selecting the one with 275 marks which had no extrinsic support for the three additional marks, rather than the one with 272, which was confirmed by the certificates of the six election officers, and it is not claimed or suggested that the one with 272 marks did

not contain "clear, positive, original and contemporaneous entries or records" of votes actually cast and "set down upon said tally sheet by the clerk," etc., just as the answer speaks of the other one. Indeed, it is not pretended that they differ in any respect, excepting as to the number of marks, and, as we have seen, the number on the one corresponds with the certificate of the election officials, while the other does not.

There is not the slightest justification in the statute for pursuing such a course. They were not only *not required* to choose between the two tally sheets, but they had no authority to add three votes to those returned by the judges and clerks, merely because they found three more marks on the one tally sheet. If that were permitted, then a dishonest clerk of election might add some marks in his tallies without it being observed by others, agree with the other clerk as to the correct number, so as to throw him and others present off their guard, and then have them brought to the attention of the canvassers, who could count them if what is set up in this answer authorized those marks to be counted. Possibly some marks might in some way be fraudulently added after the judges and clerks signed the returns, or what may be more probable, a clerk might unintentionally make an extra mark in a tally without noticing it, or in the dim light election officials sometimes have to contend with, he might, in endeavoring to make a mark more distinct, have two instead of the one. Moreover, as there were five marks in a block (as the petition alleges and the answer does not deny), the presumption would be in favor of the one which consistently had only five, rather than the one which had six marks in three blocks, especially if, as the petition alleges, "said three blocks were in each case tallied by the clerk of election as containing five marks each." Other suggestions in support of the tally sheet having 272 marks might be stated, but it is not necessary.

By section 73 of Article 33 of the Code, at the close of the polls, the judges are required to open the ballot box, "and count and announce the whole number of ballots in the box."

Then when all the ballots have been canvassed, as directed
by the statute, "the election clerks shall compare their tallies
together and ascertain the total number of votes received by
each candidate, and when they agree upon the numbers, one
of them shall announce in a loud voice to the judges the
aggregate number of votes received by each candidate."
After that each of the judges of election is required by sec-
tion 74 in turn, to "proclaim in a loud voice the total number
of votes received by each person voted for," and "such proc-
lamation shall be *prima facie* evidence of the result of the
canvass. of such ballots." Section 75 requires the judges to
make duplicate statements or returns of the result of the
canvass, "showing the whole number of votes in the ballot
box, and the whole number of votes given for each person,
designating the office for which they were given, and at the
end of such statement shall be written a certificate that the
same is *correct in all respects;* which certificate and each
sheet of paper forming a part of the statement shall be sub-
scribed by the judges and clerks." It is then provided that
each of the statements shall be enclosed in an envelope, se-
curely sealed, etc., and in the counties one of the envelopes
shall be directed to the Clerk of the Circuit Court and one
to the County Commissioners. *"Each set of tallies* shall also
be signed by the election clerks and the judges of election,
and each shall be enclosed in an envelope, securely signed
and sealed as aforesaid, one of which shall be addressed to
the Board of Supervisors of Election, and the other to the
Register of Wills."

Then after providing in section 76 for the care of the
ballots, ballot boxes, etc., section 77 provides that in the
counties "each of said two judges (those who are also regis-
tration officers) shall take into his possession one of the
registers and also one of the statements of the votes cast,
sealed up in its envelope as aforesaid, and also one of the
tally sheets, sealed up in an· envelope as aforesaid, and the
meeting of the judges and clerks shall then be dissolved."
Provision is also made for challengers and watchers being

allowed to be inside the guard-rail "and so near that they can see that the judges and clerks are faithfully performing their duties." Section 71.

These and other provisions show the great care taken by the Legislature to secure honest counts and returns, but if the Board of Canvassers, or a majority of them, can ignore the certificates required to be executed with so many safeguards thrown around them, and give a candidate three more votes than the four certificates signed by the six election officials show he had, merely because they find three more marks on one of two tally sheets, then the statute would be a farce instead of affording protection.

Any possible ground upon which the canvassers could claim the right to count more votes for a candidate than the judges and clerks of election return, must be under section 85, unless perhaps there be some error in addition or of some kind too clear for controversy. That section provides that "If, upon proceeding to canvass the votes, it shall *clearly appear* to the canvassing board for the city or county, that in any statement or tally sheet produced to them certain matters are omitted which should have been inserted, or that any mistakes exist," they shall do what?—"they shall immediately issue a subpoena to the judges and clerks who made said return and said judges and clerks shall forthwith attend and shall make such corrections as the facts of the case require, but such changes shall not alter any decision before duly made by them, but shall cause the canvass to be correctly stated; and the said Board of Canvassers are authorized to adjourn from day to day for the purpose of obtaining and receiving such corrected statements, such adjournment not to extend beyond three days."

That section does not authorize the *canvassers* to correct mistakes—"said *judges and clerks* shall forthwith attend and *shall make such corrections* as the facts of the case require," etc. But these canvassers did not even have the judges and clerks before them—on the contrary they changed the vote returned by the six election officials, without doing the only

thing they were authorized to do, if it clearly appeared to them that a mistake existed, and did not even claim in their answer that any of those election officials had since said or intimated that they had made a mistake. Who has said that the return of 272 votes was a mistake? The canvassers cer-. tainly could not know that it was and they utterly failed to inquire of those who might have known, if there was a mistake. They content themselves by saying they had to choose between the two tally sheets and, as we have seen, do not produce any satisfactory reason for selecting the one standing by itself in preference to the other sustained by the several certificates of all of the election officials. If the clerk whose tally sheet had 275 marks on it made a mistake, is Noll to suffer in consequence? Presumably, the clerks did their duty, compared their tallies and ascertained the total number of votes received for each candidate, *"and when they agreed upon the number"* one of them announced the result. If one had 272 and the other 275 for O'Malley, and after ascertaining the number of votes received by him, they agreed upon 272 as correct, is Noll to suffer because the three marks were improperly added, but not scratched off? It is no evidence of a mistake existing when the returns were signed that one tally sheet had 272 and the other 275, for they may have been reconciled by the clerks and the correct figure ascertained, as was their duty to do and what in the absence of something to the contrary they presumably did.

It seems to us that there is no room for controversy, and there can be *no* doubt that the canvassers had no authority whatever under the circumstances and under our statutes to count 275 votes instead of 272, the number returned by the election officials for O'Malley.

The only remaining question is whether the lower Court should have directed the judges and clerks of election to be summoned, requiring them to attend before the canvassers and make such corrections in the returns as the facts of the case require, etc. The petitioner Noll did not ask for that, and the only reference to section 85 is in the answer in which the defendants allege that it was not mandatory, but

that where the mistake is clearly apparent from a comparison of the two tally sheets, they themselves may "compute and declare the result from the face of the tally sheet, which they believe and decide to be correct; without, as a condition precedent thereto, summoning the election officials, making the returns and requiring them to correct the same." We need only read the statute and the decision of this Court in *Price* v. *Ashburn,* quoted above, in reply to such a claim. They then go on to say that if it was an error to count 275 votes for O'Malley without summoning the election officials, then the Court may, under section 86, require the defendants to correct said error "by summoning the said judges and clerks of election to make the correction *in accordance with the finding, decision and determination of the Board of Canvassers, as aforesaid."* In other words, the canvassers do not suggest that the election officials be summoned to make corrections of mistakes they find were made, but such as are "in accordance with the finding, decision and determination" of the canvassers. That would require the Court to first assume that the judges and clerks have made a mistake in not certifying that O'Malley had 275 votes, instead of 272 votes, although it is nowhere suggested in the answer that there was such a mistake beyond the mere fact that the canvassers who say they "had to choose" between the two tally sheets, chose the one containing 275 marks, for the reasons set out in the answer, which reasons, as we have already indicated, are not based on any authority of law or anything which justified them in making such a choice. Of course, the Court did not adopt that suggestion of the defendants, and by that part of its order only intended to require the canvassers to do what section 85 required them to do, if it *clearly appeared* that there was a mistake, when they met to canvass the vote, but under the circumstances we think that there was error in that part of the order.

The petitioner does not admit that there was a mistake in the returns and did not ask for a mandamus to require the canvassers to summon the judges and clerks of election be-

fore them, but on the contrary he is in this Court complaining of that part of the order. If it was necessary and proper to have them before the canvassers in order to correct the error made by the canvassers, we are not prepared to say that the Court could not have included that in its order, although not specifically stated in the prayer for a mandamus, as under those circumstances it would only be requiring what had to be done in order to have the error of the canvassers corrected.   But from what we have already said it will be seen that we are of opinion that it is not shown that there was a mistake in the returns of the judges and clerks, and it is not even claimed that they or any of them now say there was in fact a mistake within the meaning of section 85.   It by no means follows that because one tally sheet had 275 marks on it, and the other only 272 marks, there was a mistake in the number of votes returned, for, as we have seen, if the 275 marks were on the one when all the ballots had been canvassed, the presumption is that the clerks performed the duty expressly required of them by section 73, that is to say, compared their tallies and ascertained the total number of votes received by each candidate, which they could then accurately do, and it was their duty to do, by again examining the ballots, if necessary, or making such other investigation as could then be made.   Moreover, before announcing the aggregate number of votes received by each candidate they presumably agreed upon the number, as the statute requires.   If it be suggested that the clerks might not have observed the discrepancy between the two tallies, which would be contrary to the presumption of law, then how could either of them now say that the marks were then there, or that the one with 275 was right and the other wrong?   The ballots are no longer accessible to them and they no longer have the means of information which they then had.   It is not suggested, much less alleged, in the answer, that it was agreed that 275 was the correct number and that that was so announced, but by mistake 272 was returned.

But beyond all that, section 85 shows on its face that the

Legislature intended that such corrections as were authorized by it should be promptly made, if at all, for while it author- ized the Board of Canvassers to adjourn from day to day for the purpose of obtaining and receiving corrected statements, it is provided that "such adjournment not to extend beyond three days." The Legislature undoubtedly realized the dan- ger of granting any considerable time for such corrections, especially when the result is close. We think it would be establishing a dangerous precedent to permit the judges and clerks of election to be now brought before the canvassers for the purpose of correcting returns in such respect as this.

We have not thought it necessary to discuss the cases cited from other States, as none of them reach the controlling ques- tions in this case. By reason of the similarity between the New York statute and our own, the case *In re Stewart,* 24 N. Y. App. Div. 201, S. C. 48 N. Y. Sup. 963, approved in 155 N. Y. 545, is perhaps more instructive and pertinent than most of the others, but we have no doubt about the tally sheets being part of the returns, for our statute makes them so, and we would not be inclined to differ with the New York Courts or the other Courts in reference to many of the matters stated in the cases cited. We have, however, been referred to no case which tends to sustain the action of the canvassers in deliberately ignoring the statute and, without even seeking information from the judges and clerks of election so far as appears in the record, rejecting the returns made by the four judges and two clerks under such circumstances as we have shown above. There is certainly no case anywhere which justified the canvassers, acting under such a statute as ours, in throwing out the vote of the First Precinct of the Second District. So while the attorneys for the canvassers have shown great skill and industry in the pre- sentation of their case, both orally and in their brief, we are unable to adopt their views.

We are of the opinion that there was error in that part of the order of the lower Court in reference to the judges and clerks being summoned, but we entirely agree with it in sus-

taining the demurrer to the answer and requiring the canvassers to reconvene and to canvass, etc., the votes in the First Precinct of the Second Election District. We will affirm the order in part and reverse it in part and remand the case so that the lower Court may pass an order for a mandamus in accordance with this opinion. It may be well to add that in said order the Court should direct the writ of mandamus to issue as prayed in the petition, commanding the defendants to reconvene as a Board of Canvassers, and to correct the error they made in counting 275 votes for John F. O'Malley in the Sixth Election District, and to state, certify and return that the vote for said O'Malley in that election district was 272 votes and not 275 votes as originally certified by them; also commanding them to canvass the votes for the office of Clerk of the Circuit Court for Howard County in the First Precinct of the Second Election District of said county, as shown by the returns and tally sheets thereof delivered to said Board of Canvassers, and to add up said votes, and requiring them to file with the Clerk of the Circuit Court for Howard County certificates and statements showing that the vote for said O'Malley in the Sixth Election District has been and is recorded by the said Board of Canvassers as 272 votes, and of the result of the canvass of said board of the votes for said office of clerk in the First Precinct of the Second Election District, as shown by the returns and tally sheets thereof delivered to said Board of Canvassers. We do not deem it necessary to prepare the form of the order, as suggested by the petitioner, as the lower Court can do so and can include anything they may deem necessary or proper to carry out our views as herein expressed.

> *Order affirmed in part and reversed in part, and cause remanded in order that an order may be passed directing the writ of mandamus to issue in accordance. with this opinion, the appellants in No. 110 to pay the costs.*